IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY

ARVEST BANK,                          )
an Arkansas banking corporation,      )
                                      )        Case No. <u>12-cv-2068</u> CM/KGS
                    Plaintiff,        )
                                      )
v.                                    )
                                      )
AMERICAN ENERGY SOLUTIONS,            )
INC., a Missouri corporation,         )
                                      )
MICHAEL W. MOORE,                     )
an adult individual,                  )
                                      )
and                                   )
                                      )
RAYMA S. TYSON,                       )
an adult individual,                  )
                                      )
                    Defendants.       )

## COMPLAINT

COMES NOW Plaintiff Arvest Bank ("**Arvest**"), by and through its respective

undersigned counsel, and for its claims and causes of action against Defendants American

Energy Solutions, Inc. ("**American Energy**"), Michael W. Moore ("**Moore**") and Rayma S.

Tyson ("**Tyson**"), states and allege as follows:

*The Parties*

1.       Arvest is a commercial bank organized and existing under the laws of the State of

Arkansas, having an office located at 7401 West 135th Street, Overland Park, Kansas.

2.       American Energy Solutions, Inc. ("**American Energy**") is an energy consulting

corporation organized and existing under the laws of the State of Missouri, having an office

located at 10601 Mission Road, Suite 210, Leawood, KS 66206.

3.      Moore is an adult individual who resides at and who may be served at 4731 West 78th Street in Prairie Village, Kansas.

4.      Tyson is an adult individual who resides at and who may be served at 7295 Covered Bridge Road in Platte City, Missouri.

***Jurisdiction and Venue***

5.      This Court has subject matter jurisdiction over this matter pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1961, *et seq.*  This Court also has supplemental jurisdiction over Arvest's state law claims pursuant to 28 U.S.C. Section 1367.

6.      Defendants are subject to personal jurisdiction in this district, in that the wrongful actions described herein all occurred within the State of Kansas.

7.      Venue is proper in this Court in this matter pursuant to 28 U.S.C. Section 1391(b).

***American Energy Solutions, Inc., and the Defendants' Various Roles With Respect to American Energy Solutions, Inc.***

8.      American Energy provides energy consulting services including conservation strategies, energy audits and tariff management, co-generation capacity development, project management, and price hedging.

9.      Moore was a co-founder of American Energy and was, at all times relevant to this Complaint, the President and Chief Executive Officer of AES.

10.     Tyson was an officer and director of American Energy and acted as Moore's personal assistant, and, at all times relevant to this Complaint, Tyson was involved in the internal accounting activities of American Energy.

2170334.2

*Lending Relationship Between Harrington Bank and American Energy*

11.     On January 31, 2009, American Energy and Harrington Bank (**"Harrington"**) entered into that certain commercial loan transaction (the **"Loan"**), pursuant to which Harrington agreed to lend to American Energy a principal amount not to exceed $2,500,000.00, in accordance with the terms of that certain Business Loan Agreement dated January 31, 2009 (the **"Loan Agreement"**).  A copy of the Loan Agreement is attached hereto as **Exhibit 1**.

12.     Pursuant to the Loan Agreement, on January 31, 2009, American Energy signed and delivered to Harrington that certain Promissory Note in the original principal amount of $2,500,000.00 (the **"Note"**).  A copy of the Note is attached hereto as **Exhibit 2**.

13.     The Loan was not the first commercial lending transaction entered into between American Energy and Harrington.  The lending relationship between American Energy and Harrington had commenced in 2003, with certain loans made by Harrington to American Energy being refinance from time to time, and with the final refinancing occurring in the form of the Loan, on January 31, 2009.

14.     In order to secure its obligations owed to Harrington, including obligations then existing or thereafter incurred, American Energy signed and delivered to Harrington certain Commercial Security Agreements dated, respectively: September 5, 2003; July 1, 2004; June 30, 2005; November 8, 2005; and June 30, 2006 (collectively, the **"Security Agreements"**).  Copies of the Security Agreements are attached hereto as **Exhibits 3, 4, 5, 6** and **7**.

15.     Pursuant to the Security Agreements, American Energy granted to Harrington a lien on and priority interest in, among other things, all of American Energy's accounts, inventory, general intangibles, and cash and non-cash proceeds of any of the foregoing.

16.     The maturity date of the Loan was January 31, 2010.

3

17.     On or about November 6, 2009, Arvest acquired from Harrington all of Harrington's right, title and interest in the Loan.

18.     When Arvest acquired the Loan from Harrington on November 6, 2009, the Loan was current.

19.     During the one-year term of the Loan, American Energy made all of its monthly payments, although sometimes late, with respect to the Loan.  However, at maturity, American Energy failed to pay the matured balance of the Loan on January 31, 2010.

20.     After Arvest acquired the Loan in November 2009, Arvest commenced discussions with American Energy, through Moore, with respect to a potential extension of the maturity date of the Loan.  During such discussions, Moore, on behalf of American Energy, repeatedly requested that Arvest extend the maturity date of the Loan.

21.     In connection with those discussions, Arvest, on December 10, 2009, engaged Collateral Inspection Service-CIS (**"CIS"**) to perform a review of American Energy's books and records.

22.     CIS performed its review and issued a report to Arvest on February 4, 2010, at which time CIS reported to Arvest certain deficiencies in the manner in which American Energy was reporting its accounts receivable to Arvest.

23.     Arvest reported CIS' findings to American Energy, through Moore.  Moore blamed Tyson for what he called any mistakes or irregularities in the reporting of accounts receivable, stated that American Energy had a large amount of business in its pipeline, stated to Arvest that American Energy could continue to make payments on the debt, and repeated his request that Arvest extend the maturity of the Loan.

2170334.2

24.     Arvest did not agree to extend maturity of the Loan.  The parties orally agreed that American Energy would continue to pay interest on the Loan on a monthly basis, as if the Loan had not matured, while Arvest considered whether it would enforce its rights (which would have included liquidation of American Energy) or temporarily forbear from such enforcement.

25.     On or about October 4, 2010, Arvest and American Energy entered into that certain Forbearance Agreement dated as of October 4, 2010 (together with all amendments and extensions, the "**Forbearance Agreement**").  Arvest's obligation to forbear thereunder expired on October 28, 2010.

26.     As a requirement of the Forbearance Agreement, American Energy, at the request of Arvest, retained a turnaround management specialist, Iron Horse, LLC ("**Iron Horse**") to act as a restructuring officer for American Energy and to keep American Energy's creditors, including Arvest, informed with respect to American Energy's financial condition and operations.

27.     While serving as a restructuring officer for American Energy, Iron Horse reported to Arvest in November 2010 that there were deficiencies in the manner in which American Energy was reporting its accounts receivable.

***Loan Document Provisions With Respect to Accounts Receivable of American Energy***

28.     Under the Loan Agreement, the obligation of Harrington to advance loan proceeds was contingent upon the amount of such advanced amounts not exceeding the "Borrowing Base" under the Loan Agreement.

29.     Under the Loan Agreement, "Borrowing Base" was defined as the lesser of (a) $2,500,000.00 or (b) 75 percent of all "Eligible Accounts."

2170334.2

30.     Under the Loan Agreement, American Energy represented and warranted to Harrington that each "Account" used by American Energy to calculate the Borrowing Base, would meet the requirements of an "Eligible Account" under the Loan Agreement.

31.     Under the Loan Agreement, the term "Account" includes accounts receivable. Under the Loan Agreement, the term "Eligible Account" states that the net amount of any Eligible Account shall exclude any returns, discounts, credits or offsets that may be owed by American Energy to a customer in connection with any specific account receivable owed to American Energy.

32.     In addition, under the Loan Agreement, Eligible Accounts expressly exclude: any account receivable the payment of which by American Energy's customer is conditional; any account receivable owed by a customer with respect to which American Energy had not yet delivered goods or with respect to which American Energy had not yet rendered services; and any account receivable aged more than 90 days.

### The·Defendants' Wrongful Conduct

33.     Following an examination of American Energy's operations and bookkeeping methods by CIS, CIS reported to Arvest, in February 2010, that American Energy had not complied with the provisions of the Loan Agreement with respect to reporting of its accounts receivable.

34.     Following Iron Horse's examination of American Energy's operations and bookkeeping methods, Iron Horse reported to Arvest, in November 2010, that American Energy had not complied with the provisions of the Loan Agreement with respect to reporting of its accounts receivable and, in fact, had deliberately overstated the amount of its Eligible Receivables, as set forth below.

2170334.2

35.     In addition, as a result of Iron Horse's review of American Energy's books and records and as a result of Iron Horse's review of American Energy's operations and financial condition, it became clear that Moore and Tyson had both played material roles in the deliberate misreporting and overstatements to Arvest of American Energy's Eligible Receivables.

36.     Moore, as President and CEO of American Energy, and Tyson, as a director of American Energy and as Moore's personal assistant, both engaged in various practices, as set forth below, to falsely inflate, in reports from American Energy to Arvest, the amount of American Energy's accounts receivable that qualified as Eligible Receivables (the "**Account Inflation Scheme**").

37.     The Account Inflation Scheme included the following practices engaged in by the Defendants:

(a)     generating invoices for amounts not supported by any purchase orders or customer contracts, and including the amounts of such invoices in its reports to Harrington and Arvest as Eligible Receivables;

(b)     generating invoices that duplicated amounts previously billed to American Energy's customers, not sending such invoices to American Energy's customers, and then including such duplicated amounts in its reports to Harrington and Arvest as Eligible Receivables;

(c)     generating invoices for amounts reflected in purchase contracts, but for which no goods had yet been shipped and for which no services had yet been rendered by American Energy, and including the amounts of such invoices in its reports to Harrington and Arvest as Eligible Receivables;

(d)     treating accounts receivable as beginning to "age" from the date on which such

receivables were actually due, rather than from the date on which such receivables

were actually invoiced, so that some receivables that were more than 90 days due

would appear to be less than 90 days due, and including the amounts of such

receivables as Eligible Receivables in its reports to Harrington and Arvest; and

(e)     assigning due dates to accounts receivable that were far into the future, rather than

due dates that were American Energy's historical norm or due dates that were

industry norm, and then treating the payment date (and not the invoice date) as the

date on which such aging began, and then including such accounts receivable as

Eligible Receivables in its reports to Harrington and Arvest.

38.     In perpetrating the Account Inflation Scheme, Defendants put into place for

American Energy and utilized a suffix numbering system that enabled them to identify actual,

collectible receivables and those receivables that were falsely reported as Eligible Receivables

but which in fact would not be collected or would likely not be collected.

39.     Defendants used internal "credit memos" to perpetrate the Account Inflation

Scheme.  A credit memo would be generated when a true, actual Eligible Receivable was

generated, but when such Eligible Receivable had to actually replace a phantom or premature

amount which was not yet a true "receivable" (but which had already been reported to

Harrington or Arvest as an Eligible Receivable).

40.     As a result of the Account Inflation Scheme, the amounts of Eligible Receivables

reported to Harrington, and then to Arvest, were grossly inflated.

41.     Harrington and Arvest relied on American Energy, and on American Energy's

officers, agents, and professionals, to be truthful and accurate in creating and submitting reports

2170334.2

to Harrington and Arvest in which representations were made to Harrington and Arvest with respect to American Energy's accounts receivable and with respect to what accounts receivable were actually Eligible Receivables.

42.     In making the Loan to American Energy in January 2009, Harrington relied upon certain financial information provided to it by American Energy prior to the date of the Loan, which was January 31, 2009; and in acquiring the Loan from Harrington, Arvest relied upon such financial information provided by American Energy.

*Arvest's Loss*

43.     Arvest, following maturity of the Loan, worked cooperatively for months thereafter with American Energy, and with Moore, in an effort to avoid American Energy's liquidation and in an effort to keep American Energy as a going concern.

44.     In February 2011, Arvest, in cooperation with American Energy, entered into a note sale agreement (the "**Note Sale**") with Palo Verde Fund, L.P. ("**Palo Verde**"), pursuant to which Arvest sold the Note to Palo Verde.  Upon information and believe, Palo Verde simultaneously worked with American Energy, Moore and other American Energy representatives on a restructuring of American Energy by which Palo Verde would obtain an ownership interest in American Energy, by which American Energy's operations would not be terminated, and by which American Energy's accounts receivable and other property would not be liquidated.

45.     The purchase price under the Note Sale was $1,200,000.00, with $1,000,000.00 of the purchase price being payable in cash, and the other $200,000.00 being payable to Arvest pursuant to a promissory note delivered by Palo Verde to Arvest.

2170334.2

46.     Accordingly, as a result of the individual and collective wrongful actions of the Defendants, Arvest has suffered significant losses, in the aggregate in excess of $1,000,000.00, in connection with the Loan.

### Count I – Fraudulent Misrepresentation

47.     Arvest hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

48.     While engaged in the Account Inflation Scheme, the Defendants prepared financial information and reports for the express purpose of such information and reports being presented to Arvest.

49.     The financial information and reports provided to Arvest, including information making representations regarding what accounts receivable constituted Eligible Receivables, were false.

50.     The false financial information and reports were made as statements of existing material fact.

51.     The false financial information and reports were generated, and then provided to Arvest, for the express purpose of inducing Arvest to act, or to refrain from acting, upon them.

52.     The Defendants were all involved at various points in time in generating and/or presenting to Arvest such false financial information and reports.

53.     The Defendants knew that the financial information and reports were false or, alternatively and at a minimum, the Defendants acted recklessly in preparing and providing financial information and reports that were in fact false.  The Defendants also had a duty to correct such false information after it was provided, failed to correct such false information, and committed fraud by omission in failing to correct information they knew to be false.

2170334.2

54.     The Defendants knew that Arvest would rely on the financial information and reports in determining whether to make the Loan, whether to make subsequent advances under the Loan, whether to declare the Loan in default at any given time, and whether to undertake, or determine not to undertake, certain other actions with respect to the Loan.

55.     Harrington and Arvest reasonably relied on the representations made in the financial information and reports generated and provided by the Defendants in determining whether to make the Loan, whether to make subsequent advances under the Loan, whether to declare the Loan in default at any given time, and whether to undertake, or determine not to undertake, certain other actions with respect to the Loan.

56.     Arvest suffered damages as a direct and proximate result of its reliance on the false representations made in the financial information and reports generated and provided by the Defendants.

WHEREFORE, Arvest respectfully prays for the entry of judgment in its favor on this Count I, and jointly and severally against Defendants, for damages incurred as a result of Defendants' fraudulent misrepresentations, in an amount to be determined at trial, together with interest and costs, and for such other relief as the Court deems just and proper.

### Count II – Civil Conspiracy

57.     Arvest hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

58.     Defendants together constitute two or more persons.

59.     Defendants shared a common objective and sought to accomplish such objective, which was to overstate the amount of American Energy's Eligible Receivables to enable American Energy to obtain financing, including the Loan, to provide the appearance that

11

American Energy was in compliance with the terms of the Loan Agreement, to cause Arvest not to enforce its rights under the Loan, and to enable the Defendants in the meantime to receive monies from American Energy in the form of salaries, distributions and loan repayments.

60.     Defendants had a meeting of the minds in connection with the pursuit of their objective, and with regard to the dissemination of false statements contained in the financial information and reports.

61.     Defendants committed unlawful, overt acts in furtherance of their conspiracy, including in engaging in the fraudulent activity set forth herein and in preparing, generating and submitting to Arvest the false financial information and reports.

WHEREFORE, Arvest respectfully prays for the entry of judgment in its favor on this Count II, and jointly and severally against Defendants, for damages incurred as a result of Defendants' civil conspiracy, in an amount to be determined at trial, together with interest and costs, and for such other relief as the Court deems just and proper.

### Count III – RICO, 18 U.S.C. Section 1962(c)

62.     Arvest hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

63.     American Energy is an "enterprise" within the meaning of 18 U.S.C. Section 1961(4), which is engaged in, or the activities of which, affect interstate commerce.

64.     American Energy was at all times mentioned herein a continuing enterprise, in that it was used by Moore and Tyson for their improper purposes, through a repeated pattern of supplying false information to Harrington and to other lenders and investors for the purpose of obtaining loans, receiving capital infusions, and otherwise receiving favorable economic treatment.

2170334.2

65.     American Energy is separate and distinct from the pattern of racketeering activity committed by Moore and Tyson in the conduct of their affairs.

66.     Moore and Tyson committed numerous predicate acts of bank fraud, including acts in violation of 18 U.S.C. Section 1344, while conducting and participating in the conduct of American Energy's financial affairs, by creating, generating and submitting to Harrington, and to other lenders and investors, American Energy's balance sheets, accounts receivable reports, borrowing base certificates, and other financial information and reports which overstated American Energy's accounts receivable.

67.     At various times, commencing at least in September 2008, and possibly earlier, and through December 2010, Moore and Tyson caused American Energy to submit false financial information and reports to Harrington and then Arvest, while at the same time Moore and Tyson caused American Energy to remit monies and other benefits to Moore and Tyson in the form of salaries, distributions, fees, and loan repayments.

68.     Moore and Tyson further engaged in predicate acts while conducting, and participating in, the financial affairs of American Energy, by making use of the United States mail and wires to perpetrate fraudulent misrepresentations in violation of 18 U.S.C. Sections 1341 and 1343, including:

(a)     by transmitting borrowing base certificates and financial statements by mail or email to Harrington and then Arvest; and

(b)     by transmitting balance sheets, accounts receivable reports, and other financial information and reports by mail or email to Harrington and then Arvest.

69.     The predicate acts set forth herein constitute a pattern of racketeering activity in that all such actions had the same purpose (causing the amount of American Energy's accounts

receivable to be overstated so that American Energy could receive financing, cash infusions from

investors, and other favorable financial treatment), had the same participants (Moore and Tyson),

and had the same victims (lenders, including Harrington and Arvest, and investors).

70.    The enterprise, and the predicate acts in furtherance of the enterprise, were

continuing, in that they occurred over a period of years.

71.    Arvest has suffered damages as a direct and proximate result of Moore and

Tyson's violations of 18 U.S.C. Section 1962(c), in that the actions of Moore and Tyson caused

Harrington to enter into the Loan, caused Arvest to purchase the Loan from Harrington, and

caused Harrington and Arvest to take actions favorable to American Energy and/or to refrain

from taking actions not favorable to American Energy, all while Moore and Tyson benefited as a

result thereof.

72.    As a result, Arvest has suffered damages in the aggregate in excess of

$1,000,000.00.

WHEREFORE, Arvest respectfully prays for the entry of judgment in its favor on this

Count III, and jointly and severally against Moore and Tyson, for damages incurred as a result of

the activities of Moore and Tyson, in an amount to be determined at trial but in excess of

$1,000,000.00, together with treble damages, costs and attorneys fees, as provided pursuant to 18

U.S.C. Section 1964, and for such other relief as the Court deems just and proper.

## Count IV – RICO, 18 U.S.C. Section 1962(d)

73.    Arvest hereby incorporates by reference the preceding allegations of this

Complaint, as though fully set forth herein.

74.    Moore and Tyson agreed amongst themselves to engage in the Account Inflation

Scheme, in order to induce Harrington and Arvest to lend more money to American Energy, to

14

include Harrington and Arvest to take specific actions, and to refrain from taking specific actions, to induce other lenders to lend money to American Energy, to induce investors to infuse capital into American Energy, and to otherwise induce lenders and investors to confer financial benefit on American Energy.

75.     Moore and Tyson were aware that the predicate acts set forth herein were part of a racketeering activity.

76.     Both Moore and Tyson actively participated in the perpetration of the predicate acts and/or were aware of the occurrence of the predicate acts, and Moore and Tyson both knew that the predicate acts were committed in furtherance of the improper enterprise.

77.     Arvest suffered injury and damages as a direct and proximate result of Moore and Tyson's violations of 18 U.S.C. Section 1962(d), and Moore and Tyson are liable to Arvest for such damages.

WHEREFORE, Arvest respectfully prays for the entry of judgment in its favor on this Count IV, and jointly and severally against Moore and Tyson, for damages incurred as a result of the activities of Moore and Tyson, in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs and attorneys fees, as provided pursuant to 18 U.S.C. Section 1964, and for such other relief as the Court deems just and proper.

**Count V – Negligent Misrepresentation**
**(In the Alternative to Count I**

78.     Arvest hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

79.     The Defendants' representations regarding American Energy's accounts receivable, made in the course of the Account Inflation Scheme, were false.  The false

representations, made in the financial information and reports submitted to Harrington and then Arvest, were made as statements of existing material fact.

80.    Defendants made said representations in furtherance of their own financial and pecuniary interests.

81.    Defendants failed to use ordinary care or competence in creating the financial information and reports and in communicating to Arvest the information therein, and, as a result of such failure to use ordinary care or competence, caused such representations to be false.

82.    Said representations were made with the intent of inducing others, including Harrington and Arvest, to act upon them in the course of their respective businesses.

83.    The Defendants were all involved, at various times, in the preparation of the financial information and reports that were submitted to Harrington and then to Arvest.

84.    Arvest reasonably relied on the representations contained in the financial information and reports in Harrington making the Loan, in Arvest acquiring the Loan from Harrington, and in making other decisions regarding the Loan.

85.    Arvest suffered damages as a direct and proximate result of its reliance on the false representations contained in American Energy's financial information and reports.

WHEREFORE, Arvest respectfully prays for the entry of judgment in its favor on this Count V, and jointly and severally against Defendants, for damages incurred as a result of Defendants' negligent misrepresentations, in an amount to be determined at trial, together with interest and costs, and for such other relief as the Court deems just and proper.

## **DESIGNATION OF PLACE OF TRIAL**

Arvest designates Kansas City, Kansas as the place of trial.

2170334.2

Respectfully submitted,

POLSINELLI SHUGHART PC


By: _____
GREG MUSIL (KS #13398)
BRETT D. ANDERS (MO #35516)
MATT M. MORIARITY (KS #22507)
700 West 47th Street, Suite 1000
Kansas City, Missouri  64112
(816) 753-1000
Fax No. (816) 753-1536
gmusil@polsinelli.com
banders@polsinelli.com
mmoriarity@polsinelli.com

ATTORNEYS FOR PLAINTIFF ARVEST BANK

2170334.2